UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. 13-30004-RAL |
| Plaintiff, | |
| -vs- | REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS EVIDENCE AND STATEMENTS |
| JASON GARREAU | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## SUMMARY

Tribal officers received surveillance information that a gray SUV had briefly visited a suspected drug house and had just left it. The officers followed and thereafter stopped the SUV for speeding. When the driver, Jason Garreau, refused to consent to a search of the vehicle, he was handcuffed and detained. Forty-five minutes after the stop, he agreed to allow a search and then, a short time later, made inculpatory statements. He now seeks to suppress evidence seized from his person and the vehicle and his on-the-scene statements. Because the evidence and statements are excludable – and may not be used at trial for any purpose – the Court recommends that Garreau's suppression motion be granted.

# FACTUAL BACKGROUND

On the night of September 13, 2012, police officers with the Cheyenne River Sioux Tribe were conducting surveillance of a suspected drug house. Previously, they had received complaints about drugs being sold out of the house. Sergeants Farlee and Gunville observed a man, later identified as Garreau, drive up to the house in a gray Toyota 4Runner SUV, go inside and leave about a minute later. They immediately notified Officers Reede and Sampson, who were patrolling nearby, that the SUV had just left the house. The officers followed the vehicle and stopped it for speeding (36 miles-per-hour in a 25 mile-per-hour zone).

Officer Reede approached the vehicle and inquired of Garreau, the driver and sole occupant of it, about his travels that night. Garreau said that he had been "all over town" and most recently had come "from downtown." Officer Reede informed Garreau that police had been conducting surveillance on the Joaquin home and that they knew he had stopped at and departed from the residence moments earlier. Officer Reede told Garreau that the residence was a known drug house and went on to ask, three separate times, if he and Officer Sampson could search the SUV. Each time, Garreau said that he did not want to allow a search because the vehicle belonged to his wife. So Officer Reede called Sergeant Farlee, advised him that Garreau would not consent to a vehicle search and requested that he contact Lieutenant Olson and obtain a search warrant. During the call, Sergeant Farlee made Officer Reede aware that Garreau was on federal probation.

A short time later, Lieutenant Olson arrived at the scene and asked Garreau for permission to search the SUV. Garreau refused saying, as he did before, that the vehicle was his wife's. Lieutenant Olson commented that he was leaving and would be seeking a search warrant for the vehicle.

At Officer Reede's behest, Garreau submitted to a preliminary breath test (PBT). It registered negative for alcohol use. And, according to both Officers Reede and Sampson, Garreau did not appear to be under the influence of drugs either – or, for that matter, "anything."

As soon as Lieutenant Olson left, Officers Reede and Sampson handcuffed Garreau from behind and placed him in the backseat of their patrol car. Once Garreau was inside and settled, the officers got into the front seats of their car and waited, with Garreau, for an answer from Lieutenant Olson on the search warrant.

After sitting – restrained – for more than 30 minutes, Garreau hypothetically asked who would do the search if he consented to one. Officer Reede said that he would conduct the search while Garreau and Officer Sampson stood by and observed. Garreau replied, "Go ahead and search it then." Outside the patrol car, the officers removed Garreau's handcuffs and presented him with a consent to search form. He looked over the form and signed it. The officers then handcuffed him again (this time in the front) and told him that he could watch, with Officer Sampson, while Officer Reede searched the vehicle. In anticipation of the search, Garreau reached into his front right pocket to pull out a pack of cigarettes. As he did so, a clear plastic baggie fell to the ground. He quickly reached down

3

and picked up the baggie. Officer Reede grabbed Garreau's hand, and commanded him, more than once, to release what was in it. Garreau would not, even after Officer Sampson took hold of Garreau's other arm. Eventually, Garreau did let go of the baggie, was arrested and taken back to the patrol car.

As Officer Reede started walking away from the car, he glanced back and saw Garreau with a cell phone in his hand. Officer Reede returned to the car, opened the door and took the phone from Garreau. Officer Reede looked at the screen to the phone, which was still illuminated, and saw that Garreau had sent a text that said he had "just got busted with a bunch of shot." This prompted the officers to examine the baggie. Upon closer inspection, they discovered that it contained a crystal like substance and had approximately 19 smaller baggies inside it. They field tested the substance and it was positive for methamphetamine.

Back in the patrol car, Officer Sampson read Garreau his *Miranda* rights. Garreau indicated he understood his rights and was willing to waive them. When asked if the baggie contained methamphetamine, he answered, "Something like that or cocaine." He also acknowledged that he got the baggie from the house he had visited before being stopped. But he would not reveal who gave him the baggie. Still, he wanted to know what he would get for divulging his source. The officers said they could not promise him anything. He then requested to speak to a detective and the conversation ended. Afterward, the officers drove him to the tribal jail in Eagle Butte.

In the meantime, another officer transported the SUV to the police impound. There, four hours later, Officer Sampson searched the vehicle and inside of it found pills, marijuana, drug paraphernalia, Garreau's tribal identification card and some knives.

## DISCUSSION

### A. Stop

Garreau claims that his traffic stop, for speeding, was without reasonable suspicion or probable cause and therefore violated the Fourth Amendment. He says that the stop was pretextual and used as a ruse for checking on, and potentially catching him with, illegal drugs.

Officers have "probable cause to conduct a traffic stop when [they] observe[ ] a minor traffic violation. 'This is true even if a valid traffic stop is the pretext for other investigation.'"[1] The constitutional reasonableness of a traffic stop does not depend on the actual motivations of officers and their subjective intentions for making the stop are irrelevant in determining the validity of it.[2]

---

[1] *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007) (*quoting United States v. Coney*, 456 F.3d 850, 855-56 (8th Cir. 2006)).

[2] *See United States v. Herrera-Gonzales*, 474 F.3d 1105, 1109 (8th Cir. 2007); *see also United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008) (a traffic stop "is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot."); *United States v. Andrews*, 465 F.3d 346, 347 (8th Cir. 2006) (*per curiam*) ("[T]he [F]ourth [A]mendment is not violated if an objectively good reason for a traffic stop exists, whatever the actual subjective motive of the officer making the stop may have been.")

5

Traveling in excess of the posted speed limit is enough reason to make a traffic stop, even if the patrolling officers were acting on a tip that the vehicle was involved in the transportation of drugs and that tip would not, by itself, have provided justification for the stop.[3] This is true notwithstanding whether officers would have ordinarily stopped the vehicle for a speed limit violation.[4]

The reason for the traffic stop in this case – driving 11 miles-per-hour faster than what was prescribed – was both legitimate under the circumstances and constitutionally permissible. Exceeding the speed limit provided a sanctioned basis for stopping Garreau, even if Officers Reede and Sampson had in mind something other than enforcement of the speed laws.[5] The stop was supported by probable cause[6] and comported with Fourth Amendment strictures.[7]

## B. Detention

Garreau next argues that he was subjected to an unjustified and prolonged detention that was based on and resulted from repeated invocations of his constitutional right to refuse to consent to a vehicle search. He contends that his continued detention, the vast

---

[3]*See Sallis*, 507 F.3d at 649-50 (*citing United States v. Stapleton*, 10 F.3d 582, 583-84 (8th Cir. 1993)).

[4]*See id.*

[5]*See United States v. Binion*, 570 F.3d 1034, 1038 (8th Cir. 2009); *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002).

[6]*See Sallis*, 507 F.3d at 649-50; *Herrera-Gonzales*, 474 F.3d at 1109; *Andrews*, 465 F.3d at 347.

[7]*See Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (*per curiam*).

majority of which he was restrained, was premised on the speculative and uncorroborated belief that he was possessing and transporting drugs. In rejoinder, the Government maintains that his extended detention was warranted because the officers had reasonable suspicion that criminal activity was afoot and that he was engaged in it.

## 1. Reasonable Suspicion and Delay

When officers conduct a traffic stop, they may lawfully "detain the driver while they complete a number of routine but somewhat time-consuming tasks related to the traffic violation, such as, computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning."[8] Once this initial investigation is finished, however, the purpose of the traffic stop is complete and further detention of the driver or vehicle is unreasonable, unless either something during the traffic stop generates the necessary reasonable suspicion to justify a further detention or the encounter becomes consensual.[9] Officers though "may expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot."[10] To be reasonable, the suspicion must be based on specific and articulable facts which, when taken together with rational inferences from those facts,

---

[8]*United States v. Munoz*, 590 F.3d 916, 921-21 (8th Cir. 2010) (*quoting United States v. Barragan*, 379 F.3d 524, 528-29 (8th Cir. 2004)).

[9]*See Munoz*, 590 F.3d at 921 (*citing United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007)).

[10]*United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008).

7

reasonably warrant suspicion that a crime is being committed.[11] Reasonable suspicion requires more than an inchoate and generalized hunch[12] but less than probable cause needed for an arrest.[13] "Whether [officers have] reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances, in light of the officer[s'] experience[s]."[14]

A permissible traffic stop can, however, become unlawful "if it is prolonged beyond the time reasonably required to complete" its purpose.[15] Although there are no rigid time limitations on a *Terry*[16]/vehicle stop,[17] officers must nonetheless diligently pursue a means of investigation that is likely to confirm or dispel their suspicions quickly while the suspect is being detained.[18] It is the Government's burden to prove that a suspect's detention, based on reasonable suspicion, was sufficiently limited in scope and duration.[19] If

---

[11]*See United States v. Shafer*, 608 F.3d 1056, 1062 (8th Cir. 2010).

[12]*See Long*, 532 F.3d at 795.

[13]*See United States v. Spotts*, 275 F.3d 714, 718 (8th Cir. 2002).

[14]*United States v. Bracamontes*, 614 F.3d 813, 816 (8th Cir. 2010) (*quoting United States v. Gill*, 513 F.3d 836, 844 (8th Cir.), *cert. denied*, 555 U.S. 1080 (2008)).

[15]*Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

[16]*See Terry v. Ohio*, 392 U.S. 1 (1968).

[17]*See United States v. Sharpe*, 470 U.S. 675, 685 (1985).

[18]*See id.* at 686; *see also United States v. Place*, 462 U.S. 696, 709 (1983); *United States v. Royer*, 460 U.S. 491, 500 (1983).

[19]*See Royer*, 460 U.S. at 500.

reasonable suspicion for the detention is lacking or officers exceed the scope and duration of the stop, then any evidence derived from it is inadmissible at trial.[20]

After stopping and identifying Garreau, Officer Reede directed him to step out of the vehicle and walk to the back of it. There, Officer Reede inquired where Garreau had been, informed him that both the officers knew he had just come from a known drug house and requested permission to search the SUV. Garreau would not allow a search and remained steadfast in his position, despite being asked three more times. He then was handcuffed (from behind) and required to sit in the back of a patrol car for 30 plus minutes while the officers waited to hear from Lieutenant Olson on a search warrant application. Officer Reede still had not issued Garreau a speeding ticket and did not write one during the respite. At some point, Garreau wanted to know who would search the vehicle if he allowed one. When told who it would be and that he could stand nearby and watch, Garreau said to go ahead with the search and signed a consent form. By this time, 45 minutes had elapsed – two-thirds of which Garreau was shackled and all of which he was not free to leave.

Now the officers certainly had reason to suspect that Garreau may be involved in unlawful drug activity when they stopped him. They had received information that he had, minutes before, left a house where drugs were reportedly being sold. And three to four weeks earlier, Officer Reede had been involved in an arrest of two people for

---

[20]*See Wong-Sun v. United States*, 371 U.S. 471, 484 (1963); *United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001), *cert. denied*, 537 U.S. 850 (2002).

9

possession of marijuana who had come from the same house. But after the stop, nothing – other than perhaps Garreau's unwillingness to give consent to search – heightened or verified the officers' initial suspicions. Garreau was not impaired or under the influence of anything. He informed the officers that he had gone to the house to look for his brother, who he was told was not there, and was headed to his mother's residence when they stopped him. Prior to the execution of the consent form, the officers did not observe anything of significance in the vehicle or note anything that Garreau said, did or had with him that energized their suspicions. Although the officers were advised that Garreau was on federal probation, they were provided no details about his case or conviction and did not probe him for any.

Admittedly, requesting Garreau's consent to search the vehicle is a "minimally intrusive way of addressing [the officers'] reasonable suspicion."[21] But Garreau was asked four different times to give consent and then held in custody for a lengthy period of time when he refused to do so. The avowed basis for the 45-minute post-stop detention was the officers' collective suspicions that he had just gone to a drug house, purchased drugs and was in possession of them.[22] Their suspicions though, were not further aroused, much less confirmed (at least that they testified to), during these 45 minutes to justify holding him. If anything, they were undercut, to some extent, by Garreau's explanations, the officers' own observations and other circumstances.

---

[21]*Gill*, 513 F.3d at 845 (*quoting United States v. Donnelly*, 475 F.3d 946, 953 (8th Cir.), *cert. denied*, 551 U.S. 1123 (2007)).

[22]*See* Mtn. Hrg. Tr. 55-57 (March 12, 2013).

10

The rule of law in this context is not that the detention of a suspect may continue as long as the reasonable suspicion, present at the time of the initial traffic stop, remains, for if this were the rule, such stops could be continued indefinitely. Rather, as the Supreme Court has repeatedly observed, police must assiduously pursue an investigative means that is likely to resolve their suspicions one way or another in a prompt manner.[23]

Three-quarters of an hour after being stopped for speeding, Garreau was still in custody. Officers Reede and Sampson were no closer to having probable cause for an arrest and were holding Garreau until Lieutenant Olson or someone else, updated them on the status of the search warrant allegedly being sought. Whether a warrant to search the SUV would have ever been issued and when it would have arrived is anyone's guess. How long was Garreau supposed to sit – confined – in the patrol car and wait? And at what point were the officers obliged to release him – if at all?

From the outset of this traffic stop, Officers Reede and Sampson's actions were focused on drug interdiction and, as a result, the routine measures that the law required them to take care of in connection with the speeding violation, were unconstitutionally delayed. The law requires that an investigative detention be temporary and last no longer than is necessary to effectuate the purpose of the stop.[24] Garreau's detention, following his stop, was prolonged beyond what was needed and what the Constitution allows.[25] It

---

[23] *See Sharpe*, 470 U.S. at 686; *Michigan v. Summers*, 452 U.S. 692, 701, n.14 (1981).

[24] *See Royer*, 460 U.S. at 500.

[25] *See Liberal v. Estrada*, 632 F.3d 1064, 1080-82 (9th Cir. 2011) (suspect's 45-minute
(continued...)

11

amounted to a *de facto* arrest, without probable cause, and violated the Fourth Amendment.[26]

## 2. But-For Cause

The Court's conclusion that the traffic stop was unlawfully extended does not end the inquiry. This is because suppression of evidence is appropriate only when officers would not have obtained the evidence but-for the constitutional violation.[27]

Garreau's 45-minute detention, based on his travels to and from a suspected drug house, was a violation of the Fourth Amendment. He was not free to leave the moment he was stopped. His oral and written consent were the result of the illegal detention in a "but-for sense." If the detention had never taken place, and he had been sent on his way after being ticketed for speeding, the subsequent consent, given while handcuffed and locked

---

[25](...continued)
detention without probable cause, 25 to 30 minutes of which was spend in handcuffs, was unlawful because officers did not diligently pursue their investigation).

[26]*See and compare United States v. Bloomfield*, 40 F.3d 910, 916-19 (8th Cir. 1994) (*en banc*) (suspect not physically restrained in any way; officers respected his freedom of movement and privacy; and they employed the least intrusive means of detention reasonably necessary to achieve their investigative purpose), *cert. denied*, 514 U.S. 1113 (1995); *United States v. Willis*, 967 F.2d 1220, 1224 (8th Cir. 1992) (officers did not subject the suspect to any "unnecessary delays, handcuff him, or confine him in a police car.").

[27]*See United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008); *see also United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007) ("There is no reason to exclude evidence . . . if the police misconduct is not even a 'but-for' cause of [the] discovery of the evidence.").

12

in a patrol car, would not have occurred. Put another way, it was the prolonged detention that brought about the search of the SUV and seizure of evidence.[28]

## 3. Consent

But there is still, yet another, question that must be addressed: Whether Garreau's purported consent served to purge the "primary taint" of the Fourth Amendment violation that resulted from his extended detention.

It is well-settled law that a suspect's consent, obtained during the course of an illegal detention, does not legitimize or cure an otherwise invalid search.[29] Because Garreau's consent to the search was the product of an unlawful detention, "the consent was tainted by the illegality and was ineffective to justify the search."[30] This being the case, all of the evidence seized, including the baggie that was on and dropped from his person, must be suppressed as the "tainted fruit" of a "poisonous tree."

---

[28]*See United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir. 1994), *cert. denied*, 514 U.S. 1134 (1995); *see also and compare Peralez*, 526 F.3d at 1121-22 (questioning about drug trafficking during a prolonged seizure was not the but-for cause of obtaining evidence); *Marasco*, 487 F.3d at 548 (suspect not confronted with evidence obtained during illegal search before she made incriminating statements so as to make the search a but-for cause of her statements). .

[29]*See Royer*, 460 U.S. at 501, 507-08; *see also Florida v. Bostick*, 501 U.S. 429, 433-34 (1991) (observing that if consent was given during the course of an unlawful seizure, the results of the search "must be suppressed as tainted fruit.").

[30]*Royer*, 460 U.S. at 507-08; *see also Liberal*, 632 F.3d at 1082-84 (suspect's consent, made after being detained for 45 minutes and handcuffed for two-thirds of that time, was not voluntary).

13

## C. Statements

Garreau also seeks to suppress his on-the-scene statements under the exclusionary rule. He asserts that the statements, made before and after any *Miranda* advisement, were the tainted fruit of a detention that was unlawfully prolonged. To determine whether the statements were the fruit of a Fourth Amendment transgression or whether they were obtained by "means sufficiently distinguishable to be purged of the primary taint"[31] three factors must be considered: (1) the temporal proximity of the evidence discovered to the violation; (2) the existence of intervening causes between the violation and the discovery of the evidence; and (3) the purpose or flagrancy of the official misconduct.[32]

Of these factors, the third one is "the most important factor because it is directly tied to the purpose of the exclusionary rule – deterring police misconduct."[33] Courts have found actionable misconduct where the impropriety of the conduct was obvious and officers knew, at the time, that they were likely violating the suspect's rights and where their conduct was "investigatory in design and purpose and executed 'in the hope that

---

[31]*Wong-Sun*, 371 U.S. at 487-88.

[32]*Brown v. Illinois*, 422 U.S. 590, 603-04 (1975); *see also Wong-Sun*, 371 U.S. at 491.

[33]*United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (*citing United States v. Reed*, 349 F.3d 457, 464-65 (7th Cir. 2003)).

14

something might turn up.'"[34] An unreasonable mistake, however, is not sufficient by itself to establish flagrant misconduct.[35]

Garreau's statements were all made while he was being unlawfully detained. They flowed directly from the Fourth Amendment violation and were inseparable from it.

There were no intervening circumstances that purged the taint of the constitutional violation. Significantly, Garreau's declarations were uttered in the same location where the violation occurred. The fact that his Mirandized incriminations took place after he gave consent and unveiled the baggie of methamphetamine is of no consequence. He had already been detained too long when these events occurred.

Beyond this, the illegality had a quality of purposefulness and flagrancy. Keeping Garreau in custody for 45 minutes, with every intention of holding him on an open-ended basis for much longer, was an obvious impropriety. The officers ignored, or gave no credence to, what they saw and Garreau told them and continued to detain him because of their pre-stop suspicions that he was a drug courier. The stop and detention, both in design and purpose, were investigatory. The officers were looking for drug evidence and planned to hold him, for however long it took, until they could gain access to the SUV and ally their suspicions. The manner in which Garreau was treated likewise had a purposeful and flagrant element to it. Indeed, after refusing, a fourth time, to consent to a search, he was handcuffed from behind, locked in a patrol car and kept there for more than a half an

---

[34]*Simpson*, 439 F.3d at 496 (*quoting Brown*, 422 U.S. at 605).

[35]*See id.*

15

hour. This response, to him exercising a constitutional right, was a deliberate act, not a mistake. Inasmuch as Garreau's statements were the product of him being in unlawful custody (i.e., were "come at by exploitation" of a Fourth Amendment infringement),[36] the statements – even the Mirandized ones – must be suppressed in their entirety as substantive and impeachment evidence.[37]

## CONCLUSION

Garreau's initial traffic stop for speeding was entirely proper. But the officers impermissibly extended the scope and prolonged the length of the stop. While with him, they did not develop any new or added suspicions, beyond what they had before pulling him over, that criminal activity was afoot. As the fruit of his illegal detention, the officers discovered physical evidence and obtained incriminating statements from him. They would not have been able to do so but-for the detention. Garreau's subsequent consent and the giving of *Miranda* warnings did not purge the taint of the prior unlawful conduct. Nor did it provide an elixir for the *de facto* arrest (without probable cause) of him or for the purpose and flagrancy of the officers' misconduct. Garreau's suppression motion has merit, is supported by the record and should be granted.

---

[36]*Wong-Sun*, 371 U.S. at 488.

[37]*See Brown*, 422 U.S. at 600-05; *see also and compare New York v. Harris*, 495 U.S. 14, 19-21 (1990) (where the police had probable cause to arrest a suspect, the exclusionary rule did not bar the use of a statement made by the suspect outside of his home, even though the statement was taken after he was arrested in the home in violation of *Payton*).

# RECOMMENDATION

Accordingly, it is hereby

RECOMMENDED that Garreau's Motion to Suppress Evidence and Statements[38] be granted and that the Government be prohibited from using the items seized and the statements made on September 13-14, 2012 as evidence at trial for any purpose.

# NOTICE

An aggrieved party must file written objections, within 14 calendar days, to challenge this Report and Recommendation before the assigned United States District Judge.[39]

Dated this 17th day of April, 2013, at Pierre, South Dakota.

BY THE COURT:

/s/ Mark A. Moreno

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE

---

[38] See Dkt. No. 20.

[39] See 28 U.S.C. §636(b)(1).